UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RECEIVABLES EXCHANGE, LLC | CIVIL ACTION |
| VERSUS | NO. 10-4152 |
| SUNCOAST TECHNOLOGY, INC., ET AL. | SECTION "L" (5) |

### ORDER AND REASONS

The Court has three motions pending before it: Plaintiff The Receivables Exchange, LLC's Motion for Partial Summary Judgment on Suncoast Technology, Inc's Repurchase Obligation (Rec. Doc. 68) and Motion for Summary Judgment on Defendants' Fourteenth Affirmative Defense (Rec. Doc. 69), and Defendant Joseph Gordon's Motion for Summary Judgment (Rec. Doc. 70). The Court has reviewed the briefs and the applicable law and now issues this Order and Reasons.

### I.     BACKGROUND

Although the contracts involved are complex, the transactions they accomplish are fundamentally simple to understand. Businesses routinely acquire accounts receivable, which are "debt[s] owed by a customer to an enterprise for goods or services." *Black's Law Dictionary* 19 (9th ed. 2009). Those accounts receivable can be bought and sold. Plaintiff The Receivables Exchange, LLC ("TRE") operates an electronic auction marketplace for accounts receivable that connects sellers and buyers. A seller (the business that is owed money by its customer) may place its accounts receivable on TRE's exchange and sell them at a discount to face value in exchange for an immediate payment; the buyer obtains the discounted right to be paid the full face value of the account receivable at a later date or over a period of time.

This case arises out of Defendant Suncoast's sale on TRE's exchange of twelve accounts

receivable owed to it by non-party Millenium Tele Card, Inc., (the "Millenium Receivables"). In 2010, Suncoast sold the Millenium Receivables to various buyers and received $978,986.55 from the sales.[1] Upon sale, the buyers, not Suncoast, became the owners of the Millenium Receivables and were entitled to receive payment of the face value. Nonetheless, it is undisputed that Suncoast subsequently directed Millenium, its customer, to pay the amounts owed pursuant to the Millenium Receivables to one of Suncoast's creditors instead of to the buyers who now owned the receivables. The buyers of the Millenium Receivables have yet to receive anything.

TRE has filed suit in its own capacity and on behalf of the buyers against Suncoast and its President, Joseph Gordon. TRE alleges that Suncoast and Gordon breached the applicable contracts governing the sale of the Millenium Receivables, committed fraud and conversion, and breached a fiduciary duty. The specific allegations will be discussed in connection with the relevant pending motions for summary judgment.

## II.   PRESENT MOTIONS

The Court has three motions pending before it, two filed by Plaintiff TRE and one filed by Defendant Gordon.

<u>First</u>, Plaintiff renews its motion for partial summary judgment on the question of Suncoast's repurchase obligations under the applicable contracts. TRE submits an affidavit authenticating the contracts involved and establishing that the buyers of the Millenium Receivables have never been paid. TRE seeks judgment as a matter of law that Suncoast is contractually obligated to repurchase the Millenium Receivables from the buyers and pay

---

[1]The buyers are not parties to this case. Pursuant to the applicable agreements, TRE has a contractual right to proceed against sellers such as Suncoast on behalf of buyers on its exchange.

associated fees and expenses.

Second, TRE moves for summary judgment in its favor on Defendants' fourteenth affirmative defense. The fourteenth affirmative defense alleges that the contracts and transactions in question constitute "the unregistered sale of Securities pursuant to Federal Law, thus rendering the transaction unenforceable." (Rec. Doc. 58 at 8; Rec. Doc. 59 at 8). TRE argues that Suncoast, as seller, cannot benefit from federal securities law to rescind or avoid enforcement of its contractual obligations. TRE also argues that Suncoast specifically waived this defense and agreed that receivables traded on the exchange are not securities.

Third, Defendant Gordon moves for summary judgment on all claims against him in his individual capacity. He argues that these claims against him fail as a matter of law or as a matter of fact because he was not a party to any contract giving rise to a fiduciary duty and because he disclosed all relevant financial information.

The Court will address these motions in sequence.

### III.    LAW AND ANALYSIS

#### A.    Standard on Motions for Summary Judgment

A district court can grant a motion for summary judgment only when the "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When considering a motion for summary judgment, the district court "will review the facts drawing all inferences most favorable to the party opposing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986). The court must find "[a] factual dispute . . . [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party . . . [and a] fact . . . [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v.*

*Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir. 1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir. 1995). The mere argued existence of a factual dispute will not defeat an otherwise properly supported motion. *See Anderson*, 477 U.S. at 248. "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249-50 (citations omitted).

**B.     Plaintiff TRE's Motion for Summary Judgment on Repurchase Obligations**

First, TRE moves for partial summary judgment on Defendant Suncoast's allegedly unconditional contractual obligation to repurchase the Millenium Receivables.  Resolution of this motion, and Suncoast's arguments in opposition, depends in large part on understanding the multiple documents that comprise the contractual relationship between TRE, Suncoast, and the buyers of the Millenium Receivables, as well as the sequence and procedures for selling receivables on the Exchange.

**1)     Contractual Framework**

The undisputed record evidence reflects that transactions on TRE's Exchange are governed by a series of contracts and policies collectively referred to as the Program Agreements, "all of which shall comprise the agreements of the Parties with respect to the Program, the Exchange and Program Transactions."  (Rec. Doc. 68-4 at 19).  The Program Agreements include the Master Program Agreement, the Rules and Procedures, and the Seller Agreement, among other materials.  The Program Agreements govern any sale of receivables on

the Exchange.

First, before any party can buy or sell receivables on TRE's Exchange, that party must execute a Master Program Agreement. The Master Program Agreement defines certain terms and sets global conditions that apply to use of the Exchange. Receipt and execution of the MPA precedes any sale of receivables; the MPA itself is not a mechanism of sale. Indeed, a party that executes an MPA is never obligated to buy or sell any receivables on TRE's Exchange.

Second, there is a Seller Agreement that governs every individual sale of receivables on TRE's exchange.[2] The Seller Agreement contains the Repurchase Obligation that TRE seeks to enforce through this motion. Pursuant to the Repurchase Obligation, if a receivable sold over the exchange has not been paid by the seller's customer to the buyer ninety days after the receivable becomes due, then the seller has an unconditional and irrevocable obligation to repurchase the receivable from the buyer "for a Repurchase Amount to be determined by TRE":

> Section 21.  Repurchase Obligations.
> A.     Seller absolutely, unconditionally, and irrevocably agrees to repurchase one or more Traded Receivables from the Buyer or Buyers thereof for a Repurchase Amount to be determined by TRE:
> (i)     if for any reason the Account Debtor fails to pay the Face Value of the Traded Receivable, in full and in Good Funds, by no later than the 90th day following the Invoice Due Date; or
> (ii)    when and if the Account Debtor raises any defense to payment or otherwise demonstrates that it is unable or unwilling to pay the Face Value of the Traded Receivable in full when due; or
> ...
> (iv)    at the time of the occurrence of any Seller Event of Default.
> SELLER'S REPURCHASE OBLIGATIONS UNDER THIS SELLER AGREEMENT ARE ABSOLUTE, UNCONDITIONAL AND IRREVOCABLE AND ARE NOT SUBJECT TO ANY CLAIM THAT SELLER MAY HAVE

---

[2]The Seller Agreement is part of the Program Agreements "all of which shall comprise the agreements of the parties with respect to ... the Program Transactions," (Rec. Doc. 68-4 at 3), and "Program Transactions" include "purchases and sales of Traded Receivables over the Exchange," (Rec. Doc. 68-4 at 54). Thus, the terms of the Seller Agreement are incorporated in every sale of receivables.

>    AGAINST THE BUYER OR TRE OR ANY DEFENSES TO PAYMENT
>    (INCLUDING SURETYSHIP DEFENSES), ALL OF WHICH ARE
>    KNOWINGLY WAIVED BY SELLER.

(Plaintiff's Exhibit 4 at 5, Rec. Doc. 68-4 at 7). That is to say, the Seller Agreement makes abundantly clear that in the event that a seller sells a receivable on the Exchange, and the receivable goes unpaid for more than ninety days, the seller will have to repurchase the receivable from the buyer.

Third, there is a document entitled "Rules and Procedures" that sets forth additional terms that "apply to all Sellers and all Buyers of Receivables over" the Exchange. (Rec. Doc. 68-3 at 20). The Rules and Procedures are also expressly part of the Program Agreements. The Rules and Procedures set forth the Repurchase Date applicable to any given sale of receivables, after which the seller's Repurchase Obligation is triggered, as well as the amounts due on the Repurchase Date:

>    Every auction on the Exchange has a pre-determined Repurchase Date on which
>    the Seller is absolutely obligated to repurchase **the unpaid portion of the Traded
>    Receivables plus all accrued Discount Fees**. The Repurchase Date for an auction
>    composed of a single individual Receivable is determined by adding 90 calendar
>    days to the Invoice Due Date. The Repurchase Date for an auction composed of a
>    basket of Receivables is determined by adding 90 calendar days to the last
>    Invoice Due Date in the auction.

(Procedures at p. 14, Rec. Doc. 68-3 at 29) (emphasis added). Thus, the Rules and Procedures define how to calculate the Repurchase Date, as well as what amounts are owed on that date, based on the value and characteristics of any particular receivable sold on the Exchange.

Finally, the Rules and Procedures explain how the seller, in placing a specific receivable on the Exchange, controls the Repurchase Date and Repurchase Amount that could potentially be due pursuant to the Program Agreements. When placing a receivable on the Exchange, the seller selects two parameters: a Minimum Advance Amount, which is the lowest percentage of

the face value of the particular receivable that the seller is willing to accept at auction, and a "Maximum 30-Day Discount Fee," which is the highest percentage of the face value of the receivable that the Seller is willing to pay the buyer between the close of the auction and the date the buyer is paid:

> At the time of posting a Receivable or a basket of Receivables for sale, the Seller is asked to specify the Minimum Advance Amount that the Seller is willing to accept from the Buyer and the Maximum Discount Fee that the Seller is willing to pay over each 30-day period following the Auction Closing Date.
> ....
> The Discount Fee is based on the amount of money earned by the Buyer every 30 days after the Auction Closing Date. The Buyer earns Discount Fees on a daily basis for each day that the Traded Receivable remains unpaid after the Auction Closing Date or until such time when the Advance Amount and all accrued Discount Fees have been repaid.

(Rec. Doc. 68-3 at 27-28).

To tie the elements together, a seller first receives the Program Agreements, including the MPA, the Seller Agreement, and the Rules and Procedures, in advance of actually attempting to sell any receivables on the Exchange. The Program Agreements govern future sales. When a seller places a receivable for sale on the Exchange, the self-selected Advance Amount and Maximum Discount Fee, combined with the due date on the face of the receivable itself, establish the potential Repurchase Date and Repurchase Amount due should the receivables sell and go unpaid.

**2) Analysis**

TRE submits competent summary judgment evidence establishing that Suncoast executed the MPA, a Seller Agreement, and the other materials comprising the Program Agreements. The record contains an unrefuted affidavit from TRE's Chief Operations Officer, who has personal knowledge that "Suncoast Technology, Inc. executed the Master Program Agreement,

Seller Agreement, and Seller Security Agreement electronically pursuant to the Louisiana Uniform Electronic Transaction Act, La. R.S. 9:2601, et seq." (Exh. 7, Rec. Doc. 68-5 at 1). TRE also submits a document that purports to be a record of Suncoast's electronic execution of the agreement. (Exh. 9, Rec. Doc. 77-1 at 4). Suncoast's corporate representative testimony suggests that Suncoast received the Program Agreements, although he could not remember whether they were executed electronically or on paper. (Rec. Doc. 77-1 at 2, 19:5-12). Moreover, sale of the Millenium Receivables undoubtedly occurred, and the TRE affidavit establishes that executing a Seller Agreement "is a prerequisite to selling receivables over the Exchange." (Rec. Doc. 68-5 at ¶¶ 3, 5).[3]

Thus, there is no factual dispute that Suncoast executed all of the pertinent Program Agreements. Likewise, there is no factual dispute that the buyers of the Millenium Receivables have never been paid. Therefore, TRE argues that as a matter of law it is entitled to summary judgment that the unconditional repurchase obligation created by Section 21 of the Seller Agreement has been triggered. Pursuant to that obligation Suncoast would be obligated to

---

[3]Suncoast possibly opposes the motion for summary judgment on the grounds that it purportedly did not execute a Master Program Agreement. No such argument appears in the "Law & Argument" section of its memorandum in opposition, but in the statement of facts "it is denied that a Master Program Agreement, Seller Agreement and Seller Security Agreement was ever executed as no documents were signed," and "TRE does not require that a Seller sign the MPA, nor does a signed MPA exist in this matter." (Rec. Doc. 71-1 at 1, 5). In support of this contention, Suncoast cites "Exhibit C, Brand Depo" "26:14-15." (*Id.* at 5). The exhibits to Suncoast's opposition contain a number of pages from depositions, few of which identify the deponent and none of which are the twenty-sixth page of a deposition. Thus, Suncoast has not submitted competent summary judgment evidence that could possibly support a conclusion that it never executed the MPA or any other agreement.
    The Court notes that Gordon's own motion for summary judgment asserts as an undisputed fact that "Suncoast executed an MPA." (Rec. Doc. 70-3 at 5). The Court also notes that it is hardly plausible that Suncoast sold the Millenium Receivables on TRE's exchange, and pocketed almost a million dollars for those sales, without ever having executed the agreements setting forth the terms of those sales. In short, if Suncoast in fact contends that it did not execute the MPA or any other agreement, it has not raised a genuine fact issue on that point.

8

repurchase the Millenium Receivables from the buyers, in the amount of its sale price and the accrued discount fees in an amount to be discussed below.

The Repurchase Obligation in the Seller Agreement is clear and unambiguous, and the triggering event (nonpayment of the Millenium Receivables) has occurred.  TRE has demonstrated that it is entitled to judgment as a matter of law that Suncoast's Repurchase Obligation has been triggered.  Suncoast's corporate representative acknowledged this obligation to repurchase the Millenium Receivables.  (Rec. Doc. 68-4 at 12).  The burden on summary judgment then shifts to Suncoast to raise some dispute of fact or other reason why judgment as a matter of law is inappropriate.

In opposition, Suncoast argues the Repurchase Obligation is unenforceable because it is impermissibly vague as to the repurchase amount, either because it does not contain a dollar amount or because it delegates calculation to the sole discretion of TRE.

"Interpretation of a contract is the determination of the common intent of the parties." La. Civ. Code art. 2045.  "A contract is formed by the consent of the parties established through offer and acceptance."  La. Civ. Code art. 1927.  "Sale is a contract whereby a person transfers ownership of a thing to another for a price in money.  The thing, *the price*, and the consent of the parties are requirements for the perfection of a sale."  La. Civ. Code art. 2439 (emphasis added). "An agreement whereby one party promises to sell and the other promises to buy a thing at a later time, or upon the happening of a condition, or upon the performance of some obligation by either party, is a bilateral promise of sale or contract to sell.  Such an agreement gives either party the right to demand specific performance.  A contract to sell must set forth the thing and *the price*, and meet the formal requirements of the sale it contemplates."  La. Civ. Code art. 2623.  "A price must be fixed by the parties in a sum either certain or determinable through a

method agreed by them." La. Civ. Code. art. 2464. "The price may be left to the determination of a third person. If the parties fail to agree on or to appoint such a person, or if the one appointed is unable or unwilling to make a determination, the price may be determined by the court." *Id.* art. 2465.

Suncoast argues that the Program Agreements, which it received and executed before it sold any receivables, did not contain a fixed price for an eventual Repurchase Obligation. In the absence of a price, Suncoast argues there it could not have consented and therefore TRE cannot enforce the Repurchase Obligation. *See* La. Civ. Code arts. 2439, 2623. In support of its arguments, Suncoast submits lengthy deposition excerpts confirming that it received the Program Agreements before it sold any receivables, and thus before any specifics as to price or due dates are made concrete. TRE does not disagree, but reiterates that "[t]he *formula for calculating such sums* is agreed upon by all sellers in the Program Agreements prior to any auction ever taking place." (Rec. Doc. 77 at 6) (emphasis added).

Suncoast is correct that the Program Agreements do not themselves contain an express dollar amount, but the argument misses the mark entirely. The Program Agreements, including the Seller Agreement containing the Repurchase Obligation, are a prerequisite to selling receivables on the Exchange and therefore they necessarily precede any actual sale. It is impossible and illogical for the Program Agreements to contain a specific Repurchase Obligation reduced to a sum certain when nothing had been sold in the first place.

But subsequently Suncoast did sell the Millenium Receivables on the Exchange, and received almost a million dollars for them. It is those sales that were governed by the terms of the Program Agreements which Suncoast had previously received and executed. And it the application of the previously-agreed-to Program Agreements to those sales that creates an

10

unambiguous, enforceable Repurchase Obligation. That is, by selling receivables on the Exchange with full prior knowledge of the terms that would govern each and every sale, Suncoast consented to all the terms of the Program Agreements, including the Repurchase Obligation.[4] Suncoast's argument to the contrary rings hollow, and is akin to someone signing up for a credit card and agreeing to pay 18% interest on the balance, then refusing to pay the interest because the balance could not be predicted when the agreement was signed.

In short, Louisiana law clearly permits parties to agree to a method for determining a contractual price. *See* La. Civ. Code art. 2464. The Program Agreements that preceded sale of the Millenium Receivables provided precisely such a method. To the extent that the method charges TRE with performing arithmetic to determine the Repurchase Amount, that too is permitted under Louisiana law. *See* La. Civ. Code art. 2465. Suncoast cites no authority holding such an arrangement unenforceable. Accordingly, as a matter of law the Repurchase Obligation is enforceable against Suncoast.

### 2) Calculation of Repurchase Amount

TRE sets out by affidavit the amounts it seeks in summary judgment on the repurchase obligation: (1) the Advance Amount Suncoast received through the auctions, in the amount of

---

[4]Suncoast argues that there is a fact issue precluding summary judgment because its corporate representative did not recall seeing a "pop-up window" before submitting accounts receivable for sale over the Exchange. (Rec. Doc. 71 at 12-13). This does not raise a genuine dispute of material fact. The Program Agreements expressly govern all future sales on the Exchange, and there is no genuine dispute of fact that Suncoast received and executed the Agreements in advance of any sales. Even if TRE provided a "pop-up" reminder of any terms in the advance of sale, and one Suncoast employee did not personally recall that "pop-up," Suncoast actually sold the Millenium Receivables, and actually received almost one million dollars for them. On the state of the record, no reasonable trier of fact could find that Suncoast did not consent to be bound by the terms of the Program Agreement; to find otherwise would be to find that Suncoast sold accounts receivable worth more than a million dollars subject to no contractual terms at all, which is patently absurd.

$997,986.55[5]; (2) the Discount Fees for each auction, which have been accruing in the amount selected by Suncoast for each thirty-day period the receivables have gone unpaid, in the amount of $712,165.26; (3) late charges set forth in the Seller Agreement, in the amount of $356,034.29; and (4) an Administrative Fee and Failed Payment Fee, in the amount of $2,910.21. The total Repurchase Amount TRE seeks is $2,069,096.31.

Suncoast does not challenge these amounts as calculated by TRE, but merely contends that there is no enforceable Repurchase Obligation. (Rec. Doc. 71-1 at 3-4). The only argument Suncoast offers regarding the amount of damages is that, if there is an enforceable Repurchase Obligation, it should be "a market-based, fair market value determination of Repurchase Amount." (Rec. Doc. 71 at 14). To that end, Suncoast submits the report of a forensic accountant who concludes that "the fair market value as of September 10, 2010 of a second lien interest in the accounts receivable at issue is zero." (Rec. Doc. 71-2 at 23).

Suncoast offers no authority, either in the Program Agreements, in case law, or in the realm of logic, supporting its argument that "the more reasonable reading" would permit it to sell the Millenium Receivables for almost one million dollars and then repurchase them for nothing. The Rules and Procedures adequately define the repurchase amount as "the unpaid portion of the Traded Receivables plus all accrued Discount Fees." (Rec. Doc. 68-3 at 29). Nor is there anything "arbitrarily determined" about the Repurchase Amount, as Suncoast suggests.

Because the Repurchase Obligation is enforceable and because Suncoast has not

---

[5]The Rules and Procedures potentially support a recovery of the face value of the Millenium Receivables, rather than the discounted amount that the buyers paid and Suncoast received. (Rec. Doc. 68-3 at 29) ("Every auction on the Exchange has a pre-determined Repurchase Date on which the Seller is absolutely obligated to repurchase **the unpaid portion of the Traded Receivable** plus all accrued Discount Fees.") (emphasis added). TRE seeks only the Advance Amount that Suncoast received, and not the face value of the Receivables. (Rec. Doc. 68-1 at 7 n.6).

genuinely disputed the Repurchase Amount as calculated by TRE, summary judgment in favor of TRE in the amount of $2,069,096.31 is granted.

**C.    Plaintiff TRE's Motion for Summary Judgment on Defendants' Fourteenth Affirmative Defense**

TRE moves for summary judgment on Suncoast and Gordon's fourteenth affirmative defense, which asserts that the Millenium Receivables transactions were sales of unregistered securities that are unenforceable under federal law. TRE argues both that Suncoast as a seller is not a beneficiary of the applicable federal law, and further that Suncoast waived this defense and is estopped from contending that the Millenium Receivables are securities within the meaning of federal law. Suncoast opposes on the grounds that the waiver is contained in an unenforceable contract and therefore cannot be asserted against it, and because federal securities law prevents it from being forced to repurchase the Millenium Receivables.

The motion can be resolved on the straightforward basis that Suncoast contractually agreed that receivables are not securities and waived its fourteenth affirmative defense. The Master Program Agreement, which Suncoast executed and which forms part of every sale of the Millenium Receivables, expressly provides that:

> Each seller and each buyer agrees and acknowledges that Seller Receivables posted/offered for sale over the Exchange are not "securities" under any federal or state securities law or regulation.
> TRADED RECEIVABLES ARE NOT REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933 OR WITH THE SECURITIES COMMISSIONER OF ANY STATE OR JURISDICTION.

(Rec. Doc. 69-3 at 13). The language is unambiguous and, as the Court held above, is part of an enforceable contract. Suncoast cites no cases declining to enforce a similar waiver of defense. It also fails to explain how its present argument is consistent with its prior contractual

acknowledgment that the Millenium Receivables are not securities. Accordingly, the Court finds it appropriate to grant TRE's motion for summary judgment on this basis, without addressing any issues of federal securities law.[6]

**D.      Defendant Gordon's Motion for Summary Judgment**

TRE's amended complaint asserts causes of action for fraud, breach of fiduciary duty, and conversion against Defendant Gordon in his individual capacity. (Rec. Doc. 56 at 19-22). Defendant Gordon moves for summary judgment on all of those claims.

**1)      Conversion**

"A conversion consists of an act in derogation of the plaintiff's possessory rights, and any wrongful exercise or assumption of authority over another's goods, depriving him of the possession, permanently or for an indefinite time, is a conversion." *Quealy v. Paine, Webber, Jackson & Curtis, Inc.*, 475 So. 2d 756, 760 (La. 1985). Conversion can take many forms:

> A conversion is committed when any one of the following occurs: 1) possession is acquired in an unauthorized manner; 2) the chattel is removed from one place to another with the intent to exercise control over it; 3) possession of the chattel is transferred without authority; 4) possession is withheld from the owner or possessor; 5) the chattel is altered or destroyed; 6) the chattel is used improperly; or 7) ownership is asserted over the chattel.

*Dual Drilling Co. v. Mills Equip. Invs., Inc.*, 721 So. 2d 853, 857 (La. 1998) (citation omitted). "It has long been established in Louisiana that a corporate officer may be personally liable for conversion committed on behalf of the corporation." *United States v. Hibernia Nat'l Bank*, 882 F.2d 961, 964 (5th Cir. 1989); *Tubos de Acero de Mexico, S.A. v. Am. Int'l Inv. Corp., Inc.*, 292 F.3d 471, 479 (5th Cir. 2002). Thus, when a corporate officer "personally put[s] ... funds beyond

---

[6]The Court notes the apparent inconsistency in Suncoast's position that the securities laws protect it from having to repurchase the Millenium Receivables but offer no protection to the buyers who purchased those same receivables. The Court also notes that Suncoast cites no cases finding that an account receivable is a security within the meaning of federal law.

the reach of the true owner," that individual "cannot escape personal liability because he was a corporate officer." *Hibernia*, 882 F.2d at 965.

After selling the Millenium Receivables on TRE's exchange, Gordon on behalf of Suncoast directed Millenium to make payments on those receivables not to the TRE lockbox, from which they would have been directed to the new owner of the receivables, but rather to Simple, Suncoast's creditor. This fact is not disputed. This fact establishes that a conversion occurred.

Gordon's arguments to the contrary are misguided and unavailing. First, Gordon severely exaggerates the holding in *In re Wittenbrink*, 849 So. 2d 18 (La. 2003), to argue that "an action for conversion of funds may not be maintained to satisfy a mere obligation to pay money." (Rec. Doc. 84). In *Wittenbrink*, the Louisiana Supreme Court held that an attorney did not commit conversion in violation of his ethical obligations by withholding funds from his employee's paycheck for taxes but failing to remit those funds to the Government. *Id.* at 23. The holding in *Wittenbrink* was quite narrow, and depended on the fact that the attorney was not obligated to segregate the withheld tax funds in a specific account. *See id.* (holding that "***under the unique facts of this case***, respondent did not convert an identifiable sum of money belonging to a third person") (emphasis added). The case does not stretch as far as Gordon takes it, and certainly does not hold that these precise facts fail to constitute a conversion as a matter of law.

Second, Gordon argues that he cannot be liable for conversion because he did not personally benefit from the payments on the Millenium Receivables diverted away from the buyers of those receivables. Louisiana law holds liable a corporate officer who converts funds to the benefit of the corporation whether or not the officer personally benefitted. *See Tubos de Acero*, 292 F.3d at 479 (explaining that liability can be premised "on the corporate officer's

participation in the corporation's act of conversion, as opposed to personal benefit, if any, that the corporate officer gained from the conversion").

Third, Gordon argues that "TRE cannot show an ownership interest in the funds." (Rec. Doc. 84). This argument also fails. Certainly, the record reflects that there were other receivables owed to Suncoast by Millenium that Suncoast did not auction on TRE's exchange. But those receivables are not at issue. Suncoast no longer had any ownership interest in the Millenium Receivables it *did* auction on the exchange, and Suncoast allegedly directed the funds owed pursuant to those Receivables to an entity other than the buyers who were owners of those receivables. These facts can support a claim for conversion of those funds, because a fact finder could possibly find that Suncoast's actions denied the buyers the right to payment of the Millenium Receivables which they owned. That fact issue precludes summary judgment.

  **2)  Fraud**

Fraud is "a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to another." *Tubos de Acero*, 292 F.3d at 479. "There are three elements to an action for fraud against a party to a contract: (1) misrepresentation, suppression, or omission of true information; (2) the intent to obtain an unjust advantage or to cause damage or inconvenience to another; and (3) the error induced by a fraudulent act must relate to circumstances substantially influencing the victim's consent to the contract." *D&J Tire, Inc. v. Hercules Tire & Rubber Co.*, 598 F.3d 200, 205 (5th Cir. 2010) (quotation omitted). Reliance is also an element. *See Sun Drilling Prods. Corp. v. Rayborn*, 798 So. 2d 1141, 1153 (La. Ct. App. 2001); *La Croix v. Recknagel*, 89 So. 2d 363, 367 (La. 1956).

Corporate officers may be held personally liable for their fraudulent acts. *See Tubos de*

*Acero*, 292 F.3d at 479 ("[A]n action seeking to hold a corporate officer or director personally liable for fraud is separate from and does not require disregard of the corporate entity under the alter ego doctrine."); *see also* La. Rev. Stat. Ann. § 12:95.

Gordon argues that he cannot be held liable for fraud because he fully disclosed the fact that Simple had a lien on Suncoast's assets. But that is not the misrepresentation of the truth that TRE argues in its opposition to summary judgment. Rather, TRE contends that Gordon affirmatively and fraudulently misrepresented the existence of a provision in a security agreement prohibiting Suncoast from selling any of its receivables.

It is undisputed that the security agreement existed, that it prohibited Suncoast from selling the Millenium Receivables on TRE's exchange, and that Suncoast and Gordon did not produce the security agreement to TRE until discovery in this case. It is further undisputed that Gordn signed a "Certification" before the auction of the Millenium Receivables. In that document, Gordon "personally certifie[d] to TRE" that "there are no restrictions on or prohibitions against Seller selling its Receivables to Buyers over the Exchange." (Rec. Doc. 72-1 at 1). It is the misrepresentation contained in that Certification that TRE alleges was fraudulent.

In his reply, Gordon persists in arguing that his disclosure of the UCC-1 filing statement absolves him from any liability. He does not address the Certification that he signed or explain how it did not misrepresent the undisclosed terms of the Simple security agreement prohibiting sale of the Millenium Receivables. He also does not refute TRE's assertion that if the security agreement terms had been disclosed, the Millenium Receivables would not have been sold on the exchange. Although Gordon argues that TRE had all of the pertinent information before it, yet chose to ignore it," (Rec. Doc. 84 at 3), a reasonable trier of fact could conclude that TRE did

17

not have all of the material information and that Gordon's Certification was a fraudulent misrepresentation intended to deceive TRE and the buyers about that material information.

Gordon also argues that summary judgment is appropriate because he lacked fraudulent intent as a matter of law. He apparently predicates this argument on the disclosure of the UCC-1 filing statement and the existence of the lien; as explained above, that is not the actionable misrepresentation that TRE pursues. Gordon also apparently argues that his motivation throughout the transactions was "a desire to keep Suncoast afloat as a going concern." (Rec. Doc. 70-1 at 11). This does not defeat summary judgment; a reasonable trier of fact could find that defrauding Peter to pay Paul nonetheless entails an intent to defraud.

In short, this issue is pregnant with material factual disputes that preclude summary judgment. A reasonable trier of fact could certainly conclude that Suncoast was forbidden from selling the Millenium Receivables; that Gordon affirmatively certified to the opposite with the intent to defraud; and that TRE and its buyers reasonably relied on Gordon's personal certification to their detriment. To the extent that Gordon argues that TRE should have conducted due diligence and discovered materials that directly contradicted Gordon's express certification, that too is an issue for the trier of fact. The motion for summary judgment is denied as to the fraud claim.

### 3) Breach of Fiduciary Duty

Finally, Gordon moves for summary judgment on TRE's claim against him for breach of a fiduciary duty. "Generally, whether a fiduciary duty exists, and the extent of that duty, depends upon the facts and circumstances of the case and the relationship of the parties." *Scheffler v. Adams & Reese, LLP*, 950 So. 2d 641, 647 (La. 2007). "Corporate officers and directors owe a fiduciary duty to their corporation and its shareholders." *E.g.*, *Terrebonne*

18

*Concrete, LLC v. CEC Enter., LLC*, 76 So. 3d 502, 510 (La. Ct. App. 2011). "They do not, however, owe such a duty to persons or entities that contract with the corporation." *Id.* In addition those general principles of Louisiana law, the Seller Agreement that Suncoast executed prior to selling the Millenium Receivables states that **Suncoast** is a fiduciary with respect to funds it receives pursuant to receivables sold on the exchange:

> D. At all times while Seller may have any portion of the Collection Proceeds of a Traded Receivable in Seller's possession, Seller shall hold the same as the fiduciary, "in trust" for and on behalf of TRE and the Buyer. Seller absolutely, unconditionally and irrevocably agrees not to use such Collection Proceeds for Seller's own benefit in any respect.

(Rec. Doc. 72-1 at 54).

Gordon contends that there is no factual or legal basis for finding a fiduciary relationship between himself and TRE or the buyers of the Millenium Receivables. He argues that as a corporate officer of Suncoast he owed a fiduciary duty to Suncoast, not to parties with which Suncoast contracted. Moreover, Gordon argues that he did not execute any Seller Agreement in his individual capacity, and did not voluntarily undertake a fiduciary relationship.

In response, TRE recites ample case law defining the origin and parameters of a fiduciary duty. However, none of those authorities find under any factual circumstances that an officer of a corporation that contractually assumes a fiduciary duty shares in that duty and subjects him or herself to personal liability for breach of that duty. Rather, TRE makes a policy argument that if Gordon may be individually liable for his own acts of fraud and conversion while a corporate officer, "a corporate officer breaching a fiduciary duty in the name of a corporation should likewise be held accountable." (Rec. Doc. 72 at 16).

The general rule is that a corporate officer does not owe a fiduciary duty to parties which contract with that corporation. *Terrebonne Concrete, LLC*, 76 So. 3d at 510. Although Suncoast

19

voluntarily assumed the contractual role of "fiduciary" with respect to certain funds, TRE has not satisfactorily explained how Gordon also personally assumed a fiduciary role. It is a long logical leap from subjecting a corporate officer to personal liability for committing fraud or conversion against third parties, and concluding that the corporate officer also owes a fiduciary duty to those third parties. TRE has not cited relevant or controlling authority supporting that logical leap. Accordingly, it is appropriate to grant Gordon's summary judgment motion with respect to the claim for breach of fiduciary duty.

### IV.  CONCLUSION

Accordingly, for the foregoing reasons,

IT IS ORDERED that TRE's motion for partial summary judgment on Suncoast's repurchase obligation (Rec. Doc. 68) is GRANTED, in the amount of $2,069,096.31 owed pursuant to the unconditional Repurchase Obligation. Suncoast's motion for summary judgment on Suncoast and Gordon's fourteenth affirmative defense (Rec. Doc. 69) is GRANTED. Gordon's motion for summary judgment (Rec. Doc. 70) is DENIED as to the claims for fraud and conversion and GRANTED as to the claim for breach of fiduciary duty.

New Orleans, Louisiana, this __26th__ day of __March__, 2012.

_Eldon E. Fallon_
UNITED STATES DISTRICT JUDGE